UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

MERIT CAPITAL GROUP, LLC,

                    Plaintiff,

                                 Case No. 04 Civ. 7690 (RCC)

     -against-

TRIO INDUSTRIES MANAGEMENT, LLC,
TRIO INDUSTRIES HOLDINGS, LLC,
EVAN R. DANIELS, and ROBERT E. GYEMANT,

                    Defendants.

----------------------------------------------------------------X

STATE OF NEW YORK   )
                       ) ss.:
COUNTY OF NEW YORK  )

## REPLY AFFIDAVIT IN FURTHER SUPPORT OF
## PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF

HARVEY BLOCH, being duly sworn, deposes and says:

1.      I am a member of plaintiff Merit Capital Group, LLC ("Merit Capital"), and I

respectfully submit this reply affidavit in further support of plaintiff's motion for a preliminary

injunction pursuant to Fed.R.Civ.Proc. 65, prohibiting defendants Trio Industries Management,

LLC ("Trio Industries Management"), Trio Industries Holdings, LLC ("Trio Industries

Holdings"), Evan R. Daniels ("Daniels"), and Robert E. Gyemant ("Gyemant"), their agents and

all individuals and entities acting on their behalf, from (1) transferring, conveying, selling,

assigning, encumbering, hypothecating, dissipating and/or impairing the value of any

membership interests in Trio Industries Holdings and any assets or other property belonging to or held for the benefit of Trio Industries Holdings, pending final adjudication of this action; and (2) taking or carrying out any actions on behalf of Trio Industries Holdings including, but not limited to, conducting board or other corporate meetings, entering into contracts on the company's behalf, and managing the day-to-day operations of the company – and if necessary, the Court should appoint an independent receiver to manage the day-to-day operations of the company – pending final adjudication of this action.

2.      "Occam's Razor" is the principle that the simplest explanation is usually the correct one. Rather than the wild, unsupported fraudulent conspiracy urged by defendants, the simplest explanation in this case is that the financially struggling defendants entered into a loan agreement, breached that agreement, later reaffirmed in writing their obligations under that agreement but ultimately did not pay -- defendants then conjured up some counterclaims when they were sued. Defendants' arguments should be summarily rejected for the reasons set forth below. Similarly, the motion for injunctive relief by Merit Capital – which, upon defendants' default, is entitled to become the majority owner of Trio Industries Holdings and operate the day-to-day business – should be granted.

**Background**

3.      In the year 2002, defendants were "exploring the possibilities of Trio Holdings establishing manufacturing and sales facilities in Kalamazoo, Michigan and Mesquite, Texas," and were seeking financial consulting services. Affidavit of Evan R. Daniels sworn to on November 5, 2004 ("Daniels Aff."), at ¶ 3.

4.      At that time, defendants' colleague introduced defendants to us since they required assistance in their development plans. When we met, defendants represented to Merit Capital that they already had raised $6 million in equity, that those funds were available to be used as the equity component for a larger financing plan, and that defendants wished to retain the services of Merit Capital in order to assist them in their financing and development plans. Accordingly, on July 18, 2002, the parties entered into a financial services agreement, and Trio Holdings hired Merit Capital as its exclusive "financial consultant in connection with the proposed construction of the manufacturing facility and expansion of the company" (Ex. A, at page 1).

5.      Pursuant to the parties' agreement, Merit Capital, in exchange for a fee, agreed to "assist in the preparation of a Business Plan for the Company," "[r]ecommend a strategy for obtaining adequate financing for the Project," "assist[] Trio in the negotiations to obtain the support of the targeted government, private agencies and financial institutions and help[] prepare the documentation required by these entities"; and the financial services agreement provided that "Merit shall not be required to provide any services other than those referred to above" (id. at page 2).

6.      Merit Capital helped locate development sites in both Kalamazoo and Mesquite, and based on defendant's representation that it had $6 million in available equity, requested and received $10 million in industrial revenue bond financing for the development project in Mesquite.

7.      It was later revealed, however, that not only did defendants not have the $6 million in equity as previously represented, but they did not even have enough money to pay their

3

local counsel – and defendants lost the $10 million in financing in Mesquite. (In his affidavit, at para. 7, Daniels merely states that "the industrial revenue bond financing mechanism was never actually utilized.") Likewise, defendants, lacking the equity, were not able to proceed with the development projects in Kalamazoo as well.

8.      The corporate defendants were quickly running out of working capital, and they were desperate for money. Defendants were now seeking to raise $6 million in equity and $20 million in debt, and asked Merit Capital for assistance in raising this financing. We advised defendants that while Merit Capital was able to arrange debt under the parties' financial services agreement, it was not able to arrange equity because it is not a broker-dealer, and that, without the prerequisite equity by defendants, Merit Capital could not arrange the debt but could endeavor to introduce defendants to broker-dealers as well as individuals with relationships to broker-dealers (in connection with equity), and we made these introductions.

9.      At this time, the individual defendants were advancing the company their own money, and Daniels was so desperate for a cash infusion into the company that he "loaned" it substantial money from a recently received inheritance.

10.      Shortly thereafter, defendants had lined up numerous investors willing to advance the company several hundred thousand dollars – far short of their target, but sufficient for interim financing. It was clear, however, that the investors, before advancing the company these funds, wanted to be assured that they would be repaid before the officers, who had "loaned" money to the company, and this prompted the parties, by necessity, to enter into the loan agreements at issue in this case.

4

## The Participation Agreements and Other Loan Documents

11.    In order to secure the potential investors, Trio Industries Management, Trio

Industries Holdings, Daniels, and Gyemant entered into several agreements with Merit Capital in

June 2003 including a loan agreement, a promissory note, a pledge agreement, personal

guarantees, and a membership interest purchase agreement (see Exs. A-G annexed to the moving

papers). To ensure that the investors would lend defendants money, the parties agreed that the

participants would lend the money to Merit Capital, and that Merit Capital would enter into

participation agreements with each of them including even Daniels and Gyemant individually

(Ex. B). Under these agreements, Merit Capital sold each of the individuals a participation

interest in both the loan being made to defendants by Merit Capital as well as defendants'

repayment of that loan, in an amount equal to the sum advanced by each participant plus accrued

interest.

12.    The language in each of the participation agreements generally reads as follows:

"This is to certify that Merit, in consideration of the sum of $_____, the receipt of
which is hereby acknowledged . . . hereby sells (a) a divisible pro rata participation
interest to the [Participant] in (a) $_____ of the total of [the] principal amount of the
Note, and 100% of the interest payments with respect to such principal amount. . . ." (id.)

13.    Merit Capital was not a mere conduit for these participants' advances, as

defendants have suggested. In actuality, plaintiff – not defendants – assumed the legal

responsibility to re-pay each of the participants on the maturity date of the promissory note from

the proceeds of the loan repayments – again, *Merit Capital is responsible for repaying these*

*individuals.* According to the participation agreements, the participants were "entitled to receive

. . . the Participated Payments" from Merit Capital, subject to the terms of the participation

5

agreements (id.).  Defendants neglect to mention this critical fact in their opposition papers.

14.    In connection with the participation agreements, Merit Capital and defendants

entered into various loan agreements (annexed to the moving papers), all of which are clear on

their face:

> • Trio Industries Management and Merit Capital entered into a loan agreement on
> or about June 13, 2003, whereby Merit Capital agreed to loan Trio Industries
> Management up to $1 million, at 18% interest per annum.  Under the loan agreement, the
> principal balance and interest were due to be repaid by Trio Industries Management by
> January 1, 2004, except that the maturity date of the loan would be automatically
> extended to July 1, 2004, in the event that Trio Industries Management or Trio Industries
> Holdings failed to raise a certain specified amount of financing.

> • The parties' loan agreement was further evidenced by a promissory note dated June 13,
> 2003, in which Trio Industries Management (I) promised to pay to Merit Capital the
> principal sum of $1 million, or so much thereof as has been advanced, together with
> interest at the rate of 18% per annum; and (ii) acknowledged that, upon default, the entire
> principal sum and accrued interest shall at once become due and payable without notice.

> • In order to secure the timely payment of the monies owed to Merit Capital under the
> loan agreement and promissory note, Trio Industries Management pledged to Merit
> Capital all of Trio Industries Management's right, title and interest in Trio Industries
> Holdings in a pledge agreement dated June 13, 2004.  Under the pledge agreement, Trio
> Industries Management agreed that, in the event of default, *Merit Capital shall have the
> right to immediately and without notice foreclose on the pledged interests and, thereafter,
> in its sole discretion, retain, sell, pledge, assign, lend or otherwise dispose of, transfer or
> make any other disposition whatsoever, any or all of the pledged interests as its own
> rightful property, without notice to or protest by Trio Industries Management.*  Trio
> Industries Management also irrevocably appointed Merit Capital its attorney-in-fact for
> the purposes of carrying out the provisions of the pledge agreement and taking any action
> and executing any instrument which Merit Capital deemed necessary or advisable.

> • Trio Industries Holdings, Daniels, and Gyemant, as an inducement to Merit Capital to
> enter into the loan agreement, each executed individual guarantees on or about June 13,
> 2003, absolutely and unconditionally guaranteeing the timely repayment of all the loaned
> monies to Merit Capital.

• In consideration for Merit Capital's loan, Trio Industries Management and Trio Industries Holdings also entered into a membership interest purchase agreement with Merit Capital on or about June 13, 2003, *granting Merit Capital an unrestricted 20% ownership interest in Trio Industries Holdings as well as a restricted 50% ownership interest, which, due to defendants' default, has been converted to an unrestricted 50% ownership interest – for a total of a 70% ownership interest in the company –* and entitling Merit Capital to 70% of the net profits and other distributions of Trio Industries Holdings and reducing the ownership interests of Trio Industries Management by the same amount.

15.    As of June 13, 2004, Trio Industries Management already was indebted to Merit Capital in the sum of $110,000, representing funds already owed to Merit Capital for past services rendered under the financial services agreement.  See Loan Agreement dated June 13, 2003, at ¶ 3.1, annexed to the moving as Ex. A ("[Trio Industries Management] hereby acknowledges and agrees that, as of the date hereof, [Trio Industries Management] is indebted to Merit" for the sum due for Merit Capital's past work.).

16.    Under the loan agreements – which defendants breached, as set forth in greater detail in plaintiff's moving papers – defendants now owe Merit Capital more than $700,000 in principal and interest and, most importantly, are entitled to foreclose on the majority of defendants' membership interests and control the company.

17.    Pending final adjudication of this action, Merit Capital – the true majority owner holding 70% ownership of Trio Industries Holdings – should be granted the requested injunctive relief because it has a likelihood of success on the merits, it will be irreversibly harmed absent the injunction, and the balance of the equities overwhelmingly favors Merit Capital.

## Merit's Capital's Likelihood of Success

18.    As set forth above, defendants owe Merit Capital more than $700,000, and defendants are in default under the loan agreement and related documents. Based on this default, Merit Capital has the absolute right under the parties' loan agreements to foreclose on 70% of the membership interests in Trio Industries Holdings, and to immediately become the majority owner of the company. Specifically, the pledge agreement states unambiguously that:

> If an Event of Default occurs, the Pledgee shall have the right to immediately and without notice foreclose on the Pledged Interests, and may thereafter, directly or indirectly, at its sole discretion, retain, sell, pledge, assign, lend or otherwise dispose of, transfer or make any other disposition whatsoever, any or all of the Pledged Interests as its own rightful property, without notice to, or protest by, the Pledgor (Ex. C, § 9(b), annexed to the moving papers).

19.    Since defendants cannot deny that they have breached the terms of the loan agreements, Merit Capital clearly has a likelihood of success on the merits.

## I. *Defendants' Arguments*

20.    Defendants make several arguments in opposition to the motion for a preliminary injunction, all of which are deficient as a matter of law. Specifically, defendants argue that they entered into the loan agreements because they are not sophisticated; that their lawyer, Thomas Mancuso, had a conflict of interest in this matter; that there is no personal jurisdiction over the individual defendants; and that defendants were somehow fraudulently induced to entered into this transaction. These contentions are all thinly veiled, legally flawed defenses that were concocted by defendants after they were sued in this action, as set forth below.

21.    Defendants are very sophisticated businessmen who knew exactly what they were doing all along. Gyemant is a securities attorney, and Daniels, who has a series 7 license, has a

8

strong business background and formerly worked for Bear Stearns. Daniels concedes that

Gyemant and him "reviewed" the loan documents and that Gyemant had "comments," all of

which were "addressed." Daniels Aff., at ¶ 11. Terms were not "dictated" to defendants, who

understood the legal ramifications of the transaction. Gyemant and Daniels comprehended

everything fully and participated actively in the negotiation of the deal. All the parties brain

stormed and negotiated the structure of the deal together, and Gyemant finalized the papers. In

any event, defendants' purported lack of sophistication is absolutely no reason to excuse

defendants from their contractual and bargained-for obligations under the loan agreements.

22.     Merit Capital also did not act in concert with Mancuso, who, in any event, did

nothing wrong and did not have an improper conflict of interest. Mancuso was extremely

familiar with the different proposed financings, and that is why Merit Capital and defendants

agreed to proceed with him as counsel. Defendants, in fact, signed a retainer agreement with

Mancuso, and they waived any potential conflict of interest in writing. Defendants have paid

Mancuso for his services and have continued to employ him through October 2004, until

defendants began preparing their opposition papers and third-party complaint.

23.     This Court, in addition, has personal jurisdiction over Gyemant and Daniels,

notwithstanding defendant's unsupported claim otherwise. Although the individual defendants

are residents of Texas, defendants do not meaningfully dispute that the loan agreements were

negotiated, consummated and funded in New York City. Gyemant and Daniels came to Merit

Capital's office, in New York City, on many occasions before and after the execution of the loan

agreements, and defendants do not rebut this fact. Defendants' suggestion that they might have

grounds to contest jurisdiction is simply unfounded.

24.    Lastly, defendants assert that they were defrauded, claiming in conclusory language that Merit Capital represented that the deal was a "simple and routine" transaction, and that it had investors "standing by" to provide the necessary financing. This argument is the typical fraud defense made by defendants who do not wish to pay outstanding debts, and it is defective in several respects.

25.    First, the "fraud" defense lacks particularity, failing to set forth the circumstances of the alleged misrepresentations including the date and time of the statements and to whom they were made.

26.    Second, Merit Capital never made any misrepresentations or otherwise agreed to raise any financing for defendants. According to the Loan Agreement dated June 13, 2003, between Merit Capital and defendants (annexed to the moving papers as Ex. A), "the maturity date of the loan would be automatically extended to July 1, 2004, in the event that *Trio Industries Management or Trio Industries Holdings failed to raise a certain specified amount of financing*," not mentioning anything about Merit Capital raising any funds. The parties' financial services agreement also stated that "Merit shall not be required to provide any services other than those referred to" in the financial services agreement, which plainly did not obligate Merit Capital to raise financing or bring investors to defendants (Ex. A, at page 2).

27.    Third, Merit Capital actually introduced defendants to Robert Rubin, who, in turn, introduced defendants to various individuals and broker-dealer and banking firms interested in assisting defendants in raising money, including Richard Abbe, Vertical Capital Partners, Bruce Meyers, Meyers Associates, Damon Testeverde, and John Lowry. For months, these individuals and firms repeatedly requested that defendants deliver certified financial statements, so that the

10

necessary financial evaluation of the company could be made. But defendants refused to do so –
and they ultimately stopped taking my calls or emails – and the broker-dealers and other
interested parties would no longer go forward with defendants.

28.    Lastly, the most compelling piece of evidence that defendants' fraud claim is a
sham is that defendants repeatedly have admitted, in writing, that they owe Merit Capital the
sums due under the loan agreements, as set forth below.

### ii. *Defendants' Admissions That They Are Liable to Merit Capital*

29.    Other than the loan documents, there are three writings establishing beyond
cavil that defendants' claims have been concocted for the purpose of this litigation – two of the
writings authored by defendants themselves.

30.    After a meeting in my office, in New York City, on November 12, 2003, between
Gyemant, Daniels, Robert Rubin, and me, I prepared and distributed a memorandum
summarizing what had been discussed and agreed to by the participants. The memorandum
confirms that "[t]he Loan Agreement remains intact and without modification, supplemental
understanding, written or verbal. Trio acknowledges and agrees that Merit has fully vested its
20% ownership and that an additional 50% ownership as described in the agreement is pledged
. . . ." (Ex. C). Before this lawsuit, defendants never raised any objection, in any manner, to the
contents of this memorandum.

11

31.    The following year, on March 3, 2004, Gyemant wrote the following letter to

Merit Capital (Ex. D):

> [T]his letter is a follow up to our conversation of February 13, 2004, with respect
> to the Merit Loan, originated pursuant to a Loan Agreement, dated as of June 13,
> 2003, and executed by Merit Capital group, LLC and Trio Industries Management, LLC.

> As of January 1, 2004, the Merit Loan had a principal balance of approximately
> $740,000, based on the original principal amount, and subsequent contributions from
> Loan participants. . . .

> Although we had hoped to complete a substantial equity funding by the January 1
> due date, we have not as yet been successful in completing a closing. However, we want
> to assure you that we have had significant success in identifying and aligning strategic
> partners which will allow sufficient funding of Trio Industries to discharge the Merit
> Loan. While we cannot commit those funding sources today, we hope to complete the
> Merit Loan repayment by April 15, 2004. While there is always the possibility that that
> date could change, we are hoping that the April 15 date is very realistic.

> As we discussed on the phone, we hope there is no inference that Trio Industries
> does not intend to repay the Merit Loan on or before the July 1 due date. I can assure you
> that Trio Industries and each of the Guarantors with respect to the Merit Loan are fully
> aware of the obligations set forth in the documents executed with respect to the Loan, and
> are committed to discharging those obligations in strict compliance with the terms of
> those documents. . . .

32.    This letter, by itself, compellingly refutes all of defendants' assertions in their

opposition papers.

33.    The third writing is an email communication from Gyemant to me, written on July

15, 2004 (Ex. E). In that email, Gyemant states: "I expect to make a partial payment next week

to you. . . . We would expect to pay off the balance by September 30."

34.    The foregoing letters represent "smoking guns." Defendants cannot reasonably

explain away the fact that, on several occasions, including four months ago, they wrote Merit

Capital and admitted that defendants owed Merit Capital the outstanding amounts. These letters

12

make crystal clear that defendants fully understood their obligations under the agreements, that

Merit Capital was never responsible for raising any financing, that defendants owed Merit

Capital the sums due under the loan agreements, and that defendants' arguments in their

opposition papers are specious and have been asserted in bad faith. In short, Merit Capital has a

likelihood of success on the merits.

### Merit Capital's Irreparable Injury

35.    Merit Capital will be irreversibly harmed without the requested injunctive relief.

36.    This is not simply a case for money damages. Presently, defendants, who already

defaulted on the company's obligations, have unfettered control over the day-to-day business of

Trio Industries Holdings, even though Merit Capital is now the majority shareholder of the

company pursuant to the loan agreements. There is no amount of money that can compensate

Merit Capital for the loss of its right to operate their company and maintain its financial integrity.

37.    Defendants have no right to be running the business of Trio Industries Holdings,

and defendants should not be permitted to continue operating the company, and transferring and

disposing of assets as they see fit, during the pendency of this case. Merit Capital's membership

interests remain in great peril while defendants are at the helm of Trio Industries Holdings. In

order to ensure that the company's affairs are conducted appropriately, and that its assets and

membership interests are not disposed of or otherwise impaired in any way prior to the

conclusion of this litigation, it is imperative that defendants – who have no right to even be on

the company's premises – not be allowed to control and operate Trio Industries Holdings,

especially since they have no right to do so. Without an injunction, Merit Capital's membership

interests in Trio Industries Holdings, and the assets of the company, are at great risk of losing

13

part or all of their value.

38.    In stark contrast, there is no conceivable prejudice to defendants by virtue of the granting of an injunction, since defendants have no right to be operating Trio Industries Holding in the first place, and defendants will be in no worse position than they otherwise would be had they complied with their obligations under the parties' loan agreement and related loan documents.

## The Balance of the Equities Heavily Favors Merit Capital

39.    Merit Capital's intervention gave defendants' investors the confidence – confidence they needed – that the individual defendants would not utilize the investors' monies to pay themselves back. As a result, defendants received hundreds of thousands of dollars in desperately needed working capital. Under the participation agreements, Merit Capital – not defendants – assumed responsibility to pay back the participants. In exchange for Merit Capital's assistance, defendants agreed that Merit Capital would have the right to take control of and operate Trio Industries Holdings upon a default by defendants. Defendants defaulted on their respective obligations, and the individual defendants – a securities attorney and a sophisticated businessman from Bear Stearns – cannot back out of its deal now because they simply do not wish to pay.

40.    Defendants should not be rewarded for their misconduct, and the rightful majority owner of the company should be permitted to operate Trio Industries Holdings during the pendency of this case in order to endure that the company's membership interests and assets remain fully intact during the litigation.

14

41.    Defendants have refused to provide Merit Capital with an accounting, and have not disclosed how indebted the company has become or how much of the financing the individual defendants have taken for themselves. In all likelihood, defendants are impermissibly selling the same ownership to different investors in order to raise equity and/or additional money for the company, but at a minimum, it would be inequitable to allow defendants to profit from their prior wrongful actions and, at the same time, to jeopardize Merit Capital's interests in the company by not granting the injunction. If need be, an independent receiver should be appointed by the Court to oversee the operations of the company, during the litigation, and to provide Merit Capital with the financial information they are entitled to receive.

**WHEREFORE,** Merit Capital respectfully requests that an order be entered pursuant to Fed.R.Civ.Proc. 65, preliminarily enjoining Trio Industries Management, Trio Industries Holdings, Daniels and Gyemant, their agents and all individuals and entities acting on their behalf, from (1) transferring, conveying, selling, assigning, encumbering, hypothecating, dissipating and/or impairing the value of any membership interests in Trio Industries Holdings and any assets or other property belonging to or held for the benefit of Trio Industries Holdings, pending final adjudication of this action; and (2) taking or carrying out any actions on behalf of Trio Industries Holdings including, but not limited to, conducting board or other corporate meetings, entering into contracts on behalf of the company, and managing the day-to-day operations of the company – and if necessary, the Court should appoint an independent receiver to manage the day-to-day operations of the company – pending final adjudication of this action; and granting such further and additional relief as may be just and proper.

Harvey Bloch

Sworn to me before this
29 / day of November 2004

_____
Notary Public

MARK SCHWARZ
Notary Public, State of New York
No. 02SC8880770
Qualified in New York County
Commission Expires November 30, 20