UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MERIT CAPITAL GROUP, LLC,

                    Plaintiff,

-against-

TRIO INDUSTRIES MANAGEMENT, LLC,
TRIO INDUSTRIES HOLDINGS, LLC,
EVAN R. DANIELS, and ROBERT E. GYEMANT,

                    Defendants.
------------------------------------------------------------X

**AFFIDAVIT OF EVAN R. DANIELS IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

Case No. 04 Civ. 7690 (RCC)

STATE OF        )
                         : ss.
COUNTY OF     )

    EVAN R. DANIELS, being duly sworn, deposes and says:

    1.    I am a resident of Texas and an owner of fifty percent of the outstanding membership interests of Trio Industries Management, LLC ("Trio Management") and a defendant in this action. I submit this affidavit in opposition to the plaintiff's, Merit Capital Group, LLC ("Merit"), motion for a preliminary injunction enjoining Trio Management, Trio Industries Holdings, LLC ("Trio Holdings"), Robert Gyemant ("Gyemant") and me and all individuals and entities acting on our behalf from (i) transferring, conveying, selling, assigning, encumbering, hypothecating, dissipating and/or impairing the value of any membership interest in Trio Holdings and any assets or property belonging to or

held for the benefit of Trio Holdings pending final adjudication of this action; and (ii) taking or carrying out any actions on behalf of Trio Holdings.

2. Merit's motion is nothing more than an improper and brazen attempt to seize control of Trio Holdings pursuant to documents that plaintiff (and others) fraudulently induced the defendants to execute through a series of misrepresentations and outright falsehoods. As set forth below, Merit itself never provided any funding to Trio Management or Trio Holdings and only procured $83,333.33 of funding from a third party. However, Merit now claims that it is owed in excess of $700,000 and is entitled to control of Trio Holdings. Simply stated, the entire transaction at issue was nothing more than a scheme to defraud the defendants and the defendants, not Merit, are the victims here.

3. Trio Management is an owner of Trio Holdings (Trio Management and Trio Holdings are collectively referred to herein as the "Trio Parties"). Trio Holdings is engaged in the research and development of powder coating to use on wood substrates. During 2002, Trio Holdings was exploring the possibilities of Trio Holdings establishing manufacturing and sales facilities in Kalamazoo, Michigan and Mesquite, Texas.

4. To enable Trio Holdings to capitalize on the opportunities to establish manufacturing and sales facilities in Kalamazoo, Michigan and Mesquite, Texas, Trio Holdings needed to obtain approximately $5,000,000 to $7,000,000 of financing. Accordingly, I approached a number of individuals to inquire about potential sources of such financing.

5. Among the individuals with whom I discussed Trio Holdings' financing needs was Howard Bronson, a long-standing business associate of Robert Gyemant ("Gyemant"), the owner of the other fifty percent of the outstanding membership interests of Trio Management. Mr. Bronson, in turn, introduced me to Harvey Bloch ("Bloch"), a principal of Merit, and indicated that Bloch had access to sources of capital.

6. Subsequently, Gyemant and I met with Bloch and his partner, Alfred Salazar ("Salazar"), to discuss Trio Holdings' financing needs. At that meeting, Bloch and Salazar represented that they were highly experienced in raising capital for companies such as Trio Holdings and that, through Merit, they would be able to obtain the necessary financing quickly and privately since they had a number of investors "standing by."

7. Bloch and Salazar also suggested that Trio Holdings pursue municipal industrial revenue bonds to provide a portion of the required financing, and referred us to a Denver attorney, Thomas Mancuso ("Mancuso"), who they represented had a great deal of experience with municipal industrial bonds. Thus, at the suggestion of Bloch and Salazar, Gyemant and I began working with Mancuso to begin the process of applying for industrial revenue bonds in both Michigan and Texas. Ultimately, however, the industrial revenue bond financing mechanism was never actually utilized.

8. At that time, it was evident to all involved that Trio Holdings would need interim financing to satisfy its working capital needs while Merit went

through the process of securing the $5,000,000 to $7,000,000 of financing which Bloch and Salazar assured us they could obtain. Bloch stated that Merit easily would be able to obtain interim financing by raising $1,000,000 from its so-called "stand by" investors. We were told that, for Merit, $1,000,000 was a small amount of financing to obtain, and that the interim financing arrangement would be a routine and simple transaction.

9. According to the explanation provided to me by Bloch and Salazar, the contemplated series of transactions was intended to proceed as follows. First, Merit would obtain $1,000,000 of interim financing by lending Trio Holdings' parent, Trio Management, funds obtained from Merit's investors. Next, at least $6,000,000 of membership interests in Trio Management or Trio Holdings would be sold to additional investors obtained by Merit, although Trio Management and Trio Holdings were free to have their own investors participate in that transaction (the "Equity Financing"). Finally, Bloch would arrange for Trio Management or Trio Holdings to be merged with a public shell company that was owned by an associate of Bloch's, and for stock of the public company to be sold. Although I did not fully understand the shell company transaction, and Gyemant questioned how Merit could sell stock if it was not a broker-dealer, Bloch told us not to worry and assured us that the shell company transaction was legally sound and financially advantageous. Gyemant, however, stated that he had serious reservations about the shell company transaction and we informed Bloch that we needed to get more comfortable with that transaction before we would agree to it.

10. With respect to the interim financing, Bloch stated that, since Trio Management and Trio Holdings were short of funds and the interim financing transaction was not complex, Merit would pay for Mancuso to draft the necessary documents and to represent both Trio Parties as well as Gyemant and me. Mancuso echoed Bloch's statements that the interim financing was a relatively simple transaction, and assured us that he would protect our interests.

11. In May of 2003, within a week or two after Bloch informed us that Merit would provide the $1,000,000 of interim financing, Mancuso sent a package of documents to me and Gyemant in Texas. There had been no negotiation about the terms of the documents and the transaction was presented as a "package deal." Gyemant and I reviewed the documents and Gyemant had a few minor comments which Mancuso addressed, however the legal ramifications of the documents were never explained in detail by Mancuso or anyone else.

12. At the time the documents were signed in June of 2003, I understood that Merit was going to cause its investors to put up money that Merit would loan to Trio Management. It had also been agreed that Merit would receive a fee of $110,000 and a 20% interest in Trio Holdings for bringing its investors to Trio Management. Most importantly, I was led to believe that a majority, if not all, of the interim investors would convert their debt to equity interests as part of the Equity Financing, and that Merit would likely complete the Equity Financing by January 1, 2004 (the initial maturity date of the Merit loan), and certainly would complete the Equity Financing by July 1, 2004 (the date that the maturity date

would be extended to if more time was necessary to complete the Equity Financing). For this reason, I understood that Trio Management would not be required actually to repay a substantial part, or any, of the Merit loan and that plenty of funds would be available for any amount that was required to be repaid.

13. Once the documents were signed, Merit had one of its investors, Robert Rubin ("Rubin"), invest $83,333.33. In addition, my father had recently died and left me money and I agreed to loan $100,000 of that money to Trio Management. I was encouraged by Bloch and Mancuso to make that loan through the Merit loan mechanism due to supposed protections provided by the terms of the Merit loan arrangement.

14. In reliance upon the representations of Bloch and Mancuso, I loaned $100,000 to Trio Management through the Merit loan mechanism shortly after the transaction documents were signed.

15. Over the next month, Merit failed to produce a single additional investor. Gyemant and I repeatedly contacted Bloch who assured us that investors were being lined up and that funds would be forthcoming. Bloch then stopped taking our telephone calls and did not return our messages. Gyemant and I then had numerous conversations with Salazar and Mancuso in which we complained about Merit's failure to produce investors as promised. Both Salazar and Mancuso replied that they understood our frustration, but that there was nothing that they could do. Moreover, Mancuso, who was purporting to act as counsel to the Trio Parties, Gyemant and me, never took any legal action on our behalf.

16. Finally, in or about August of 2003, I was able to reach Bloch by telephone and asked why it was taking so long to get Merit's investors to make their investments, and why he had not been in contact with us. In response, Bloch attempted to accuse Gyemant and I of somehow spoiling the deal by not agreeing to the shell company transaction (which we had consistently balked at), and informed me that Merit was not going to have any of its investors participate in the transaction. I was astounded that Bloch would completely renege on all of his promises like this, and that he would leave Trio Management and Trio Holdings in such dire straits.

17. During September and October of 2003, Gyemant and I approached a number of our existing investors about making additional investments in Trio Management and Trio Holdings to provide the companies with the working capital it needed. In addition, Gyemant and I decided to put our own available cash into the companies to enable them to continue to meet its obligations. Mancuso insisted that all new investments, including the investments by Gyemant (in the amount of $30,720.81) and I (in the amount of $40,000, which was in addition to my previous $100,000 loan), should be made through the Merit loan mechanism. Mancuso represented that it was safer to invest in the Trio Parties through the Merit loan mechanism than through direct debt or equity investments due to purported protections provided by the Merit loan mechanism. Accordingly, in reliance on Mancuso's counsel, Gyemant and I consented to make our investments through the Merit loan mechanism, and to cause our investors to do the same.

18. In total, of the $739,054.14 which Merit claims is owed to it, $110,000 represents Merit's fee for the services it had agreed to provide (but didn't), $83,333.33 represents the investment made by Merit's investor, Rubin, and the balance of $545,720.81 represents the amounts invested by me, Gyemant and our investors.

19. From October of 2003 until shortly before the July 1, 2004 maturity date of the Merit loan, neither Gyemant nor I had any significant contact with Bloch or Salazar, and substantially all communications between the Trio Management, Trio Holdings and the Merit parties were through Mancuso. As the loan maturity date was approaching, I was told by Mancuso several times that Rubin was very concerned about the repayment of his investment.

20. Bloch then contacted me and asked about Trio Management's intentions to repay Rubin, and threatening about the consequences of Trio Management's failure to do so. I informed Bloch that Trio Management would repay Rubin, however Bloch insisted that Trio Management had to repay the entire amount of the Merit loan, including the amounts that were contributed by me, Gyemant and our investors. Although I wanted to have no further contact with Bloch due to his prior conduct, I agreed to meet with him and Rubin in an effort to reach a mutually satisfactory agreement.

21. In June of 2004, Gyemant and I met with Bloch and Rubin to try to resolve the situation. Bloch again stated that Trio Management could not just repay Rubin and, to my utter amazement, Bloch spent a considerable portion of

the meeting asking for another opportunity to try obtain financing for Trio Management and to arrange the shell company transaction. When Gyemant and I reacted by citing all of the misrepresentations Bloch and Salazar had made in the past and stating that they had no credibility with us, Bloch implored us to "stop talking about the past" and to go forward with Merit. Of course, we had absolutely no interest in having anything further to do with Bloch, Salazar or Merit, and have had no further contact with them.

22.     It has subsequently become clear to me that Bloch and Salazar never had any intention of obtaining financing for Trio Management or Trio Holdings, and that the loan transaction at issue in this case was simply a scheme to get our companies involved in some type of stock scheme or, if that failed, to defraud Gyemant and I out of control of Trio Holdings.

23.     Moreover, I have subsequently learned that it appears that Bloch is a convicted felon who pleaded guilty to commodity fraud and conspiracy in the mid-1980's. Specifically, as set forth on Exhibit A, in the matter of <u>United States of America v. Steven Sawyer, Harvey M. Bloch and Allan C. Leavitt</u>, Bloch entered a conditional plea of guilty to one count of commodity fraud and one count of conspiracy in connection with his involvement as the president of a "boiler room" operation at Stanford Management Corporation, a Florida commodity pool operator and trading advisor, which was found to have been "permeated with fraud." Additionally, it appears that the transaction between Merit and Trio Management was not the first one in which Bloch, Salazar and Merit acted

unscrupulously. As set forth in Exhibit B, Bloch, Salazar and Merit were sued in the matter of <u>Global View Ltd. Venture Capital v. Central Basin Exploration, L.L.C., Merit Capital Group, LLC, Harvey M. Bloch and Alfred Salazar</u>, for, among other things, fraud and fraudulently inducing a third party to enter into a loan transaction by making knowingly false statements.

24. In light of the foregoing, I respectfully urge the Court to deny Merit the relief that it seeks which would give Merit control over Trio Holdings, a company that Gyemant and I, not Merit, have toiled to create. Indeed, I continually struggle to understand how Merit, which itself never invested a penny in Trio Management or Trio Holdings and which only obtained one $83,333.33 investment, could have any basis whatsoever for ousting Gyemant and I and taking over control of Trio Holdings.

_____
Evan R. Daniels

Sworn to before me this
5th day of November, 2004:

_____
Notary Public



CHOY K. THAM
MY COMMISSION EXPIRES
February 10, 2005