Steven G. Mintz (SM 5428)
MINTZ & GOLD LLP
444 Park Avenue South
New York, New York 10016
(212) 696-4848

Attorneys for Defendants/Counterclaimants/Third-Party Plaintiffs
Trio Industries Management, LLC, Trio Industries Holdings, LLC,
Evan R. Daniels and Robert E. Gyemant

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

MERIT CAPITAL GROUP, LLC,                          :
                                                   :   Case No. 04 Civ. 7690 (RCC)
                                  Plaintiff,        :
                                                   :
            -against-                              :
                                                   :
TRIO INDUSTRIES MANAGEMENT, LLC,   :
TRIO INDUSTRIES HOLDINGS, LLC,           :
EVAN R. DANIELS and ROBERT E.             :
GYEMANT,                                           :
                                                   :
                                  Defendants.   :

---------------------------------------------------------x

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    ii

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

     A.    Events Leading Up To the Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

     B.    The Agreements Drafted by Mancuso . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

     C.    Merit's Principals Renege . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9

     D.    Merit's Commencement of This Action . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11

POINT I

     MERIT HAS NOT (AND CANNOT) SHOW THAT A
     PRELIMINARY INJUNCTION IS NEEDED TO
     PREVENT IRREPARABLE HARM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12

POINT II

     THE EQUITIES DO NOT TIP IN MERIT'S FAVOR . . . . . . . . . . . . . . . . . .    16

POINT III

     MERIT CANNOT ESTABLISH THE REQUISITE
     LIKELIHOOD OF SUCCESS ON THE MERITS . . . . . . . . . . . . . . . . . . . . .    18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

i

## TABLE OF AUTHORITIES

Page

**Cases**

*Altomare v. Balnir, Inc.*, 309 A.D.2d 683 (1st Dept. 2003) . . . . . . . . . . . . . . . . . . . . . . . .    19

*Brenntag International Chemcial, Inc. v. Bank of India*, 175 F.3d 245
(2nd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    13

*Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48
(2nd Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

*Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*, 638 F.2d 568 (2nd Cir. 1981) . . . . . . . . . .    16

*Charlesbank Equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151 (1st Cir. 2004) . . . . . . . .    12, 14

*Classic Office Supplies, Inc. v. Classic Commercial Office Prods., Inc.*,
238 A.D.2d 221 (1st Dept. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

*Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.*,
68 N.Y.2d 954 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

*Eastman Kodak Co. v. Roopak Enterprises*, 202 A.D.2d 220 (1st Dept. 1994) . . . . . . . . .    19

*Forbo-Giubiasco S.A. v. Congoleum Corp.*, 482 F. Supp. 716 (S.D.N.Y. 1980) . . . . . . .    19

*Forest City Daly Housing, Inc. v. Town of North Hempstead*, 175 F.3d 144
(2nd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    13

*International Dairy Foods Ass'n v. Amnestoy*, 92 F.3d 67 (2nd Cir. 1996) . . . . . . . . . . .    13

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27 (2nd Cir. 1995) . . . . . . . .    12

*Kamerling v. Massanari*, 295 F.3d 206 (2nd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . .    13

*Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373 (2nd Cir. 1997) . . . . . . .    12

*MONY Group, Inc. v. Highfields Capital Mgt., L.P.*, 368 F.3d 138 (2nd Cir. 2004) . . . . .    12

*New York Fruit Auction Co. v. City of New York*, 81 A.D.2d 159 (1st Dept. 1981),
aff'd 56 N.Y.2d 1015 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

*Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227 (2nd Cir. 1999) . . . . . . . . . . . .12, 13, 14

ii

*Rosen v. Siegel*, 106 F.3d 28 (2nd Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12

*Sabo v. Delman*, 3 N.Y.2d 155 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

*Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17 (2nd Cir. 2004) . . . . . . . . . . . . . . . .    16

*Tanzman v. La Pietra*, 8 A.D.3d 706 (3rd Dept. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

*Urquhart v. Philbor Motors, Inc.*, 9 A.D. 3d 458 (2nd Dept. 2004) . . . . . . . . . . . . . . . . . .    20

*Warner Vision Entertainment Inc. v. Empire of Carolina, Inc.*, 101 F.3d 259
(2nd Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

*Whitehead v. Town House Equities, Ltd.*, 8 A.D.3d 367 (2nd Dept. 2004) . . . . . . . . . . . . .    20

iii

Steven G. Mintz (SM 5428)
MINTZ & GOLD LLP
444 Park Avenue South
New York, New York 10016
(212) 696-4848

Attorneys for Defendants/Counterclaimants/Third-Party Plaintiffs
Trio Industries Management, LLC, Trio Industries Holdings, LLC,
Evan R. Daniels and Robert E. Gyemant

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
MERIT CAPITAL GROUP, LLC,                        :
                                                 :   Case No. 04 Civ. 7690 (RCC)
                                    Plaintiff,   :
                                                 :
          -against-                              :
                                                 :
TRIO INDUSTRIES MANAGEMENT, LLC,                 :
TRIO INDUSTRIES HOLDINGS, LLC,                   :
EVAN R. DANIELS and ROBERT E.                    :
GYEMANT,                                         :
                                                 :
                                    Defendants.  :
------------------------------------------------------------x

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendants Trio Industries Management, LLC ("Trio Management"), Trio

Industries Holdings, LLC ("Trio Holdings") (collectively, the "Trio Parties"), Evan R.

Daniels ("Daniels") and Robert E. Gyemant ("Gyemant")[1] (collectively, "defendants"), by

_____

[1]Daniels, Gyemant and the Trio Parties are herein collectively referred to as "defendants."

1

their attorneys, Mintz & Gold LLP, submit this memorandum of law in opposition to the

motion by plaintiff Merit Capital Group, LLC ("Merit") for a preliminary injunction

preventing defendants from (a) managing, operating or otherwise running the day-to-day

business of Tri Holdings or (b) transferring or encumbering "any membership interests in

Trio Holdings" or any asset of that business entity. The requested relief should be denied

because Merit has not made even a token showing of the "irreparable harm" required for

preliminary injunctive relief and, in fact, it is apparent even from Merit's complaint that

there is no potential "harm" in this case that is not compensable with money damages.

Furthermore, notwithstanding Merit's efforts to portray its case as a

straightforward action on a series of uncontroversial notes and loan agreements, the

material defendants have submitted makes clear that there are serious questions about the

enforceability of these agreements in light of the fraudulent representations through

which the agreements were obtained. The lack of a predicate for exercising in personam

jurisdiction in New York over the two individuals sued as guarantors also negates Merit's

"likelihood of succeeding" on the merits against those defendants.

Finally, the "equities" in this case tilt decisively against the provisional relief Merit

seeks, i.e., control of Trio Holdings. As is set forth in the November 5, 2004 affidavit of

defendant Daniels ("Daniels Affidavit") (¶ 4), Merit has never provided any funding to

Trio Management or Trio Holdings and, in fact, has only procured the relatively small

sum of $ 83,333.33 from a sole third-party investor. The remainder of the money that has

2

been raised and is supposedly "due" under the June 13, 2003 promissory note was

invested *by the individual defendants and the "participants" recruited by the individual*

*defendants*. Yet, despite the facts that (a) plaintiff has invested no money of its own, (b)

most of the money Merit now seeks came from defendants or the defendants' investors

and (c) defendants have actually offered to repay the $83,333.33 that came from Merit's

lone investor, Merit has insisted on bringing this action to recover the entire $739,054.14

"debt" and to "foreclose" on defendants' ownership interest in Trio Holding as a penalty

for defendants' supposed default.  In bringing this motion, Merit has gone even further by

seeking an *immediate* order depriving defendants of control over their own company

before any of the parties has had an opportunity to conduct discovery or present its case

on the merits.

Under the circumstances, Merit's motion for preliminary injunctive relief should

be seen for what it is: a cynical attempt to leverage a relatively small investment into a

back-door takeover of defendant's business enterprise through the use of judicial process.

Clearly, the "equities" do not support Merit's side of the argument on this motion

## BACKGROUND

### A.    Events Leading Up To the Transaction

Trio Holdings, which is owned in substantial part by Trio Management, is engaged

in the business of researching and developing powder coating on wood substitutes.

Daniels Affidavit, ¶ 3.  During 2002, the company was in the process of exploring the

3

possibility of establishing new manufacturing and sales facilities in various cities. Id. In order to be in a position to take advantage of certain opportunities that were offered in Kalamazoo, Michigan and Mesquite, Texas, Trio Holdings needed to raise approximately $5 to $7 million. Id., ¶ 4.

In pursuit of such capital, Daniels, a 50% owner of Trio Management, met with Howard Bronson ("Bronson"), a business associate of his partner, Gyemant.[2] Id., ¶ 5. It was through Bronson that Daniels and Gyemant met Harvey Bloch ("Bloch") and Alfred Salazar ("Salazar"), Merit's two principals. Id., ¶ 6. At a meeting attended by Daniels, Gyemant, Bloch and Salazar in 2002, the latter two individuals represented themselves as highly experienced in raising capital for companies such as the Trio Parties and stated that they would be able to raise the necessary private funding quickly from the investors they had "standing by." Id., ¶ 6. During the course of the discussions, Bloch and Salazar suggested that defendants simultaneously pursue municipal funding. Id., ¶ 7. It was in that context that Bloch and Salazar first introduced the name of Thomas Mancuso ("Mancuso"), an attorney from Denver, Colorado whom they identified as having considerable experience in the field of municipal industrial bonds.[3] Id.

---

[2] Both Daniels and Gyemant reside and do business in Texas.

[3] In fact, defendants worked with Mancuso in an effort to obtain industrial revenue bonds in Michigan and Texas, but they ultimately did not utilize that funding source. Daniels Affidavit, ¶ 7.

4

During the course of the dealings between the Trio Parties and Merit's principals, a plan developed to provide the former with "bridge" capital to meet the former's immediate working capital needs until the $5 to 7 million promised by Bloch and Salazar could be raised. Id., ¶ 8.  Bloch told Daniels and Gyemant that they could easily raise $1 million in interim financing and that the associated contractual arrangements would be routine and simple. Id.  As the transaction was explained to Daniels by Bloch and Salazar, Merit would "lend" Trio Holdings' parent, Trio Management, approximately $1 million in funds from investors Merit procured. Id., ¶ 9.  An additional $6,000,000 would come from the sale of membership interests in either Trio Management or Trio Holdings. Id..  These equity interests were to be purchased by additional investors obtained by Merit, with the understanding that defendants were free to bring in their own investors as well. Id.  As compensation for its part in the fund-raising endeavor, Merit was to receive a fee of $110,000 and a 20% interest in Trio Holdings. Id., ¶ 12.

Bloch and Salazar's proposal, however, did not stop at this equity funding plan. As the last step in the process, Bloch and Salazar proposed a plan in which Trio Management or Trio Holdings would be merged with a public shell corporation that was obtained by Bloch. Id., ¶ 9.  The shares of the shell company would then be sold to the public by Merit. Id..  Daniels did not fully understand this aspect of the transaction, and Gyemant raised questions about how Merit, which was not a broker-dealer, could legally sell stock to the public. Id..  Bloch attempted to reassure Gyemant and Daniels with

5

vague promises that the arrangement was legally and financially sound, but they remained skeptical and told Bloch that they "needed to get more comfortable with the [shell company] transaction" before they would be willing to go through with it.  Id.

With respect to the bridge financing arrangements, Bloch represented that the transaction was not a complex one.  Accordingly, he (Bloch) would arrange for Merit to pay the attorney Mancuso to draft the necessary documents and represent the Trio Parties, Daniels and Gyemant in the transaction between Merit and defendants.  Id., ¶ 10.  Mancuso reiterated Bloch's statements and assured Daniels and Gyemant that he would protect their interests.  Id.

In May 2003, within a week or two after Bloch confirmed that Merit would provide $ 1 million in bridge financing, Mancuso sent Daniels and Gyemant a set of documents which were supposed to embody the financing transaction. Id., ¶ 11.  The terms of the deal were dictated to Mancuso by Bloch and Salazar; there were no negotiations concerning the content of the financing documents.  Instead, they were presented to Daniels and Gyemant as a "package deal."  Id.  Although a few minor comments were exchanged, neither Mancuso nor the Merit principals ever explained the financial or legal ramifications of the various agreements to Daniels or Gyemant.  Id.

At the time they signed the documents (June, 2003), Daniels and Gyemant understood that Merit would "lend" Trio Management funds raised through its own contacts and that most, if not all, of the "debt" would be liquidated by January 1, 2004

6

(the initial maturity date of "loan") -- or July 1, 2004 (the extended maturity date) -- as a

result of the conversion of the bridge investors' interests to equity interests. Id. This

element of the transaction was critical, since it provided assurance that Trio Management

would not actually have to repay most (if not all) of the "loan" from the Merit and that

there would be plenty of funds available for any repayment that might be required. Id.

**B.    The Agreements Drafted by Mancuso**

In fact, the lop-sided loan documents that Mancuso had furnished provided no

protection for defendants and, in fact, made no economic sense from defendants'

perspective. The basic documents were a Loan Agreement and a Promissory Note.

See Affirmation of Steven G. Mintz, dated November 10, 2003 ("Mintz Affirmation").

The Promissory Note referred to an acknowledged principal amount of $210,000

as of June 13, 2003 (the execution date), representing Merit's $110,000 fee and the

$100,000 that Daniels had contributed. See Mintz Affirmation, ¶ 7; Daniels Affidavit, ¶

13. The Loan Agreement referred to the Promissory Note and provided that Merit was to

"lend" Trio Management up to $1 million from an escrow account maintained by

Mancuso, *but only to the extent that funds were obtained from third-party investors and

deposited in the account*. See Mintz Affirmation, ¶ 6. Any funds drawn from the escrow

account would be deemed to be loans to made by *Merit* to Trio Management -- regardless

of the source of the funds -- and would have to be repaid pursuant to the Promissory Note.

Id. A failure by Trio Management to pay interest and principal when due would result in

7

a default, giving Merit the right to pursue all remedies including the appointment of a receiver. Id. An accompanying Pledge Agreement gave Merit the right to exercise all of the available remedies of a secured party, including the right to foreclose on Trio Management's remaining 30% interest in Trio Holdings. Notably, the rest of Trio Management's interest in Trio holdings had been conditionally transferred to Merit under a contemporaneous Membership Interest Purchase Agreement [4] Id., ¶¶ 8-9.

In sum, although Merit's principals had induced defendants to sign the various agreements by representing that they could -- and would -- raise working capital for Trio Holdings, the agreements themselves did not impose any substantive obligations on Merit other than to act as a conduit for funds contributed by *any source*. Even money that was received from Trio Management's principals themselves was to be placed in the Mancuso escrow account and doled out to Trio Management in the form of a "loan" from Merit. See id., ¶ 11. Furthermore, under the Participation Agreements, which provided the mechanism for third-party investors to make their investments and fund the escrow account, a "participant" was to deposit its money in the escrow account with the

---

[4] Under the Membership Interest Purchase Agreement among Merit, Trio Management and Trio Holdings, Merit acquired a 20% unrestricted interest in Trio Holdings and a 50% restricted interest for consideration of $10.00. Both interests entitled Merit to an allocation of a corresponding percentage of the net profits, net losses and other distributions of Holdings. See Mintz Affirmation, ¶ 8.

In addition to the other agreements, Trio Holdings, Daniels and Gyemant guaranteed Trio Management's "indebtedness" to Merit. Id., ¶ 10 .

understanding that it would be repaid with interest only when Merit received payment under the Promissory Note. Id., ¶ 12 . Merit had no other obligation to "participants," and the "participants" were wholly unsecured. Id. On the other hand, Merit, which had absolutely no capital at risk, stood to gain ownership and control of Trio Holdings if the amount supposedly due under the Promissory Note (which included Merit's $110,000 fee) was not repaid. Id.

## C.    **Merit's Principals Renege**

In the ensuing months, Merit procured only a single investor, Robert Rubin ("Rubin"), who put in a mere $83,333.33. Daniels Affidavit, ¶¶ 13-14. Faced with the need for more capital, Daniels invested $100,000 of his own money, which he had recently inherited from his father. Id., ¶ 13. Although Daniels could have invested his money directly in Trio Management or Trio Holdings without using Merit as a "middleman," he was persuaded to funnel his investment money through the Merit loan mechanism by Bloch and Mancuso, who told him -- falsely -- that the Loan Agreement terms provided him with certain additional protections. Id., ¶ 13.

Daniels and Gyemant repeatedly complained about the situation until Bloch simply stopped taking their phone calls. Id., ¶ 15. Salazar and Mancuso continued to speak to them and expressed sympathy but offered no concrete assistance. Id. Although he was supposed to have been representing their interests, Mancuso took no legal action on Daniels's and Gyemant's behalf. Id.. When Daniels finally reached Bloch, the latter told

9

him that he and Gyemant were to blame because they had "spoil[ed] the deal" by balking at the proposal to engage in a shell corporation transaction. Id., ¶ 16. As a result, Bloch stated, Merit would not have any of its investors participate in the transaction. Id.

Merit's reneging left the Trio Parties in dire financial straits. Id. In an effort to salvage the situation, Daniels and Gyemant invested their own available cash ($40,000 and $30,720.81, respectively) and persuaded several individuals they knew to do the same. Id., ¶ 17. Once again, Daniels and Gyemant were persuaded by Mancuso to use Merit as a conduit for these investments rather than simply arranging for the funds to be given directly to Trio Management or Trio Holdings. Id. The investments made by the individual defendants and their acquaintances constitute $545,720.81 of the total $739,054.14. Id., ¶ 18.[5] Put another way, 86.75% of the money Merit is seeking in this lawsuit (excluding Merit's $110,000 "fee") actually came from Daniels, Gyemant and the investors they brought in.

In the 10 months following their collection of additional funds, Daniels and Gyemant had virtually no direct contact with Bloch and Salazar; instead, Mancuso acted as the intermediary for most communications. Id., ¶ 19. Toward the end of this period, Mancuso – and then Bloch – began to pressure defendants about repayment. Id., ¶¶ 19-20. Bloch insisted that defendants' offer to repay the $83,333.33 attributable to Rubin

---

[5]The remainder consists of the $110,000 fee Merit was to have for its services and the $83,333.333 investment made by Rubin, the investor Merit recruited.

would not suffice and that the entire amount technically owed to Merit, including the amounts contributed by defendants and their friends, had to be repaid. Id., ¶¶ 20-21. At a face-to-face meeting held less than a month before the Promissory Note's extended maturity date (July 1, 2004), Bloch reiterated his proposal to finance defendants' enterprise through the sale of securities in a "shell" corporation. Id., ¶ 21. Daniels and Gyemant once again rejected the proposal, this time adding their lack of trust in Bloch as a reason. Id.[6]

**D.    Merit's Commencement of This Action**

Having failed a second to time convince Daniels and Gyemant to participate in his "shell" corporation scheme, Bloch had Merit declare the corporate defendants in default, thereby triggering (a) the contractual provisions requiring repayment by Trio Management of the full $739,054.14 "debt" and (b) Merit's right under the Loan Agreement to wrest control of Trio Holdings from Daniels and Gyemant. See Mintz Affirmation, ¶¶ 6. Shortly thereafter, Merit commenced the present action seeking damages and declaratory relief. See Merit's Complaint. The complaint also includes a "cause of action" for a "permanent injunction" to prevent defendants from transferring the membership interests or assets of Trio Holdings or managing the company's day-to-

---

[6] Daniels's and Gyemant's suspicions about Bloch proved to be totally valid. After his own dealings with Bloch soured, Daniels learned that Bloch had pleaded guilty to commodities fraud and conspiracy in the mid-1980's and had been sued in connection with fraudulent acts in a loan transaction. Daniels Affidavit, ¶ 23.

11

day operations. Id., ¶¶ 33-37. However, it is apparent from the context that this "cause of action" is, in actuality, one for interlocutory relief pending the determination of the merits of the other three causes of action pursuant to CPLR Article 63. As such, the purported "cause of action" adds nothing to Merit's action.

**POINT I**

**MERIT HAS NOT (AND CANNOT)
SHOW THAT A PRELIMINARY
INJUNCTION IS NEEDED TO
PREVENT IRREPARABLE HARM.**

To secure preliminary injunctive relief in a federal court, the movant must demonstrate (1) that it will be irreparably harmed without an injunction and (2) either (a) a likelihood of success on the merits or (b) serious questions going to the merits to make it a fair ground for litigation and (c) a balance of hardship tipping decidedly in its favor. E.g., MONY Group, Inc. v. Highfields Capital Mgt., L.P., 368 F.3d 138 (2nd Cir. 2004); Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373 (2nd Cir. 1997); Rosen v. Siegel, 106 F.3d 28 (2nd Cir. 1997); Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27 (2nd Cir. 1995).

With respect to the "irreparable harm" prong of the analysis, the movant's claim must be grounded on something more than conjecture, surmise or unsubstantiated fears of what the future may have in store. E.g., Charlesbank Equity Fund II v. Blinds to Go, Inc., 370 F.3d 151 (1st Cir. 2004); Rodriguez ex rel. Rodriguez v. DeBuono, 175 F.3d 227 (2nd Cir. 1999). The "irreparable harm" must be shown to be imminent and actual, not remote

12

or speculative. E.g., Kamerling v. Massanari, 295 F.3d 206 (2nd Cir. 2002); Forest City

Daly Housing, Inc. v. Town of North Hempstead, 175 F.3d 144 (2nd Cir. 1999).

      The purpose of a preliminary injunction is not to give the Merit the ultimate relief

its seeks, but to prevent irreparable injury so as to preserve the court's ability to render a

meaningful decision on the merits and to keep the parties in the same positions they had

when the suit began pending final disposition. Warner Vision Entertainment Inc. v.

Empire of Carolina, Inc., 101 F.3d 259 (2nd Cir. 1996). Consistent with that goal, the

courts have repeatedly held that the "irreparable harm" claimed by the movant must be

one for which a monetary award cannot adequately compensate. E.g., Rodriguez ex rel

Rodriguez v. DeBuono, 175 F.3d 227; International Dairy Foods Ass'n v. Amnestoy, 92

F.3d 67 (2nd Cir. 1996). That simple rule is based on the common-sense premise that

monetary injury can be estimated and compensated and, consequently, a preliminary

injunction to preserve the status quo is not necessary. Brenntag International Chemcial,

Inc. v. Bank of India, 175 F.3d 245 (2nd Cir. 1999).

      Here, Merit has made no showing at all that a preliminary injunction is needed to

prevent "harm" that cannot be cured through a monetary award. Merit's two primary

causes of action are for monetary relief, i.e., repayment of defendant's purported "debt."

See Complaint, ¶¶ 21-26. Under well-established legal principles, these causes of action

clearly cannot provide a predicate for preliminary injunctive relief.

Merit's remaining substantive claim is labeled (mistakenly) one for a "declaratory judgment" but is, in reality, one for an order directing Trio Management to convey its "right, title and interest" in Trio Holdings to Merit. Id., ¶ 32. With respect to this claim, Merit has done nothing more than to allege "upon information and belief" – *and without any supporting facts whatsoever* – that "defendants are currently impairing the value of the membership interests in Trio Industries Holdings, mismanaging the company's business as well as misappropriating, dissipating and impairing the value of its property and assets." Id., ¶ 35. Merit's submissions on its motion for a preliminary injunction do not add anything to this boilerplate conclusory assertion. In fact, the "factual" affidavit Merit has submitted is valueless on this point, since it consists only of completely unsupported speculative claims, such as the allegations that defendants "very well may soon transfer, dispose of or impair the membership interests and asset of Trio Industries Holdings" and that the integrity, assets and membership interests of that company are in some unspecified way "in great jeopardy." Affidavit of Harvey Bloch, dated September 26, 2004, ¶¶ 4, 23. These are precisely the kind of conjectural and unsubstantiated charges that the courts have routinely rejected as grounds for granting injunctive relief in advance of an adjudication on the merits. See, e.g., Charlesbank Equity Fund II v. Blinds to Go, Inc., 370 F.3d 151; Rodriguez ex rel. Rodriguez v. DeBuono, 175 F.3d 227.

Finally, an order preliminarily enjoining defendants from managing their company or dealing with its assets would be improper because it would operate to give Merit the

ultimate relief its seeks rather than merely "prevent[ing] irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits and to keep the parties in the same positions they had when the suit began pending final disposition." <u>See</u> <u>Warner Vision Entertainment Inc. v. Empire of Carolina, Inc.</u>, 101 F.3d 259. The whole point of this lawsuit (other than to recover a monetary debt it claims it is owed) is to determine whether Merit is entitled to obtain control of defendants' company, Tri-State Holdings, as a result of a series of financing agreements. Merit's present demand for preliminary injunctive relief preventing defendants from continuing in their position of control presupposes a favorable answer to this question. Moreover, rather than preserving the status quo, the provisional relief Merit seeks would actually have the opposite effect and would, in fact, materially disrupt the existing operation of defendants' company.[7]

In sum, there is no factual or legal justification for granting preliminary injunctive relief in this situation. There is no evidence of any risk at all of "irreparable harm" and no basis for affording Merit the ultimate relief it is seeking in advance of a fair adjudication on the merits. For those reasons alone, the motion for a preliminary injunction should be denied.

---

[7] Significantly, Merit has not offered any suggestions as to how the company would be managed if defendants were enjoined from doing so.

15

## POINT II

## THE EQUITIES DO NOT TIP
## IN MERIT'S FAVOR.

In order to succeed in obtaining preliminary injunctive relief, the movant must

show that the harm it would suffer from denial is decidedly greater than the harm its

adversary would suffer if the motion were granted. Buffalo Forge Co. v. Ampco-

Pittsburgh Corp., 638 F.2d 568 (2nd Cir. 1981). The movant has to demonstrate "real

hardship." Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc., 601 F.2d 48 (2nd

Cir. 1979). In determining the motion, the court must strike a delicate balance between

the competing interests, with due regard for the specific facts of the individual case.

See Sunward Electronics, Inc. v. McDonald, 362 F.3d 17 (2nd Cir. 2004).

As noted in **POINT I**, supra, Merit has not alleged any specific facts suggesting

that it would suffer a hardship of any sort if the litigation were to be permitted to proceed

in the ordinary course, with discovery, pertinent motion practice and (if necessary) a trial

on the merits. Furthermore, as the affirmation of defendants' counsel makes clear, any

claim by Merit that it is suffering a "hardship" would be ludicrous.

Defendants became involved with Merit's principals because they believed --based

on the latter's representations -- that Merit could assist them in obtaining capital for a new

business venture. Relying on assurances from Merit and the attorney who was retained to

facilitate the transaction, see **POINT III**, infra, defendants entered into a series of

financing agreements that made no economic sense and placed them in a position of

16

pledging their ownership and control of the business to Merit in exchange for Merit's agreement to do nothing more than serve as a conduit for investors' funds. In the end, Merit's investors brought a total of $83,333.33 to the company, while defendants and the investors they recruited put in over $545,000 (at the specific advice of the attorney Merit's principals had introduced). When Merit's principals failed to raise the investment funds they had promised, defendants were, in effect, forced into a "default" under the terms of the Loan Agreement.

Now, Merit is not only attempting to capitalize on its own shady dealings through its lawsuit, but is actually trying to use its bare complaint as a predicate for taking *immediate* control of Trio Holdings before any discovery has been had. Having invested *no money of its own,* having procured through its own efforts only a small fraction of the funds comprising the purported "debt" and having refused defendants' offer to repay that relatively small amount of money, Merit should not now be heard to complain that it will suffer any cognizable "hardship" if it is not favored with the preliminary injunction it seeks. Indeed, application of the "balance of hardship" test alone compels denial of the present motion.

17

## POINT III

## MERIT CANNOT ESTABLISH THE REQUISITE
## LIKELIHOOD OF SUCCESS ON THE MERITS.

The litigation is in its infancy. There has been no discovery and even the

pleadings are in a state of flux.[8] Nevertheless, it is apparent even from the sparse record

before the Court that Merit's case against defendants is fatally flawed in several important

respects.

First, as is evident from defendants' answer as well as the Daniels Affidavit,

neither Daniels nor Gyemant are subject to the jurisdiction of this Court.[9] Both individual

defendants reside and do business in Texas, and neither had the kinds of significant

contacts with New York that would give rise to in personam jurisdiction here. Thus, far

from the requisite "likelihood of success on the merits," there is a strong probability that

the case against them, which is based on their individual guarantees, will be dismissed on

the threshold issue of jurisdiction.

Second, with respect to the claims against the corporate defendants, there are

important questions about the enforceability of the agreements on which Merit relies. As

indicated by the Daniels Affidavit (and as further pleadings and discovery will show),

these agreements were obtained by fraudulent representations made by Merit's principals

---

[8] On November 5, 2004, defendants served an amended answer with affirmative
defenses and counterclaims.

[9] Defendants Daniels and Gyemant anticipate requesting a pre-motion conference
as a first step toward making a motion for dismissal for lack of personal jurisdiction.

18

regarding their ability and willingness to raise investment capital for defendants'
enterprise.  Defendants justifiably relied on these and other representations, as well as on
the assurances by Mancuso (the attorney who was retained by Merit purportedly to assist
defendants in the transaction) that the transaction was a simple one and that the funding
arrangements set forth in the various agreements were in the investors' and the company's
best interest.

Under New York law, a party may rescind an agreement based on "fraud in the
inducement" where the agreement was made in reliance on a contracting party's
misrepresentation of material fact.  See, e.g., Sabo v. Delman, 3 N.Y.2d 155 (1957);
Classic Office Supplies, Inc. v. Classic Commercial Office Prods., Inc., 238 A.D.2d 221
(1st Dept. 1997); Eastman Kodak Co. v. Roopak Enterprises, 202 A.D.2d 220 (1st Dept.
1994); Forbo-Giubiasco S.A. v. Congoleum Corp., 482 F. Supp. 716 (S.D.N.Y. 1980).
Furthermore, a general merger or integration clause will not ordinarily prevent a party
seeking relief from a contract from showing fraud in the inducement.  See, e.g., Sabo v.
Delman, 3 N.Y.2d 155; Altomare v. Balnir, Inc., 309 A.D.2d 683 (1st Dept. 2003); New
York Fruit Auction Co. v. City of New York, 81 A.D.2d 159 (1st Dept. 1981), aff'd 56
N.Y.2d 1015 (1982).

A fraud my be established where (1) there has been a misrepresentation that was
false and known to be false by the party making it, (2) the misrepresentation was made for
the purpose of inducing reliance and (3) the injured party changed its position in

19

justifiable reliance on the statement. See, e.g., Urquhart v. Philbor Motors, Inc., 9 A.D.3d

458 (2nd Dept. 2004); Tanzman v. La Pietra, 8 A.D.3d 706 (3rd Dept. 2004); Whitehead v.

Town House Equities, Ltd., 8 A.D.3d 367 (2nd Dept. 2004). Even under the most

restrictive view of fraudulent-inducement claims, the New York courts recognize fraud as

a ground for rescission where the misrepresentation was collateral and extrinsic to the

specific promises in the contract itself. See, e.g., Deerfield Communications Corp. v.

Chesebrough-Ponds, Inc., 68 N.Y.2d 954 (1986).

In this case, defendants assert that they were induced to enter into the agreements

on which Merit's claims are based because of the representations of Merit's principals

that they could and would raise money for defendants' business. Daniels Affidavit, ¶¶ 6-

15. These representations were clearly collateral and extrinsic to the promises Merit

made in the financing agreements. Thus, under New York law, they are sufficient to

support a claim for rescission due to fraud.

Furthermore, there is every reason to believe that the element of justifiable reliance

will be established once the case is permitted to proceed to discovery and trial. As stated

in the Daniels Affidavit (¶¶ 10, 13, 17), Daniels and Gyemant were repeatedly assured by

attorney Mancuso that the transaction was a simple one and that it was in the best interest

of the Trio Parties and their investors. Since Mancuso, the attorney Bloch introduced,

was purportedly acting on defendants' behalf, defendants had no reason to suspect that

they were in the process of being victimized by a "bait and switch" scheme in which they

20

were promised assistance with raising capital but, in the end, received nothing of value in exchange for their agreement to a lop-sided "loan" arrangement in which Merit became the "lender" of other people's capital while risking no capital of its own.  Essentially, as embodied in the package of documents that were presented to defendants without serious discussion or negotiation, the Merit deal was not a legitimate transaction.  Rather, it was a scheme to use the Trio Parties as vehicles for implementing a stock-sale scheme or, if that failed, to acquire ownership of Trio Holdings for no actual consideration.

In view of the existing evidence of fraud in the inducement, it is unlikely that Merit will ultimately succeed in its breach-of-contract claims.  Thus, this prong of the test for preliminary injunctive relief is not satisfied, and the motion for such relief should be rejected.

## CONCLUSION

For all of the foregoing reasons, we respectfully submit that the motion for a preliminary injunction should be denied.

Dated:  New York, New York
        November 10, 2004

                                    MINTZ & GOLD LLP
                                    Attorneys for Defendants

                                    By: _____
                                        Steven G. Mintz (SM 5428)
                                        444 Park Avenue South
                                        New York, New York 10016
                                        (212) 696-4848

21